UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

INVENTORY SALES, LLC,                )
                                     )
        Plaintiff,                   )
                                     )
v.                                   )        Case No. 4:24-cv-01311-SRC
                                     )
PACKER FASTENER AND SUPPLY           )
INC. and KEITH LEFTRIDGE,            )
                                     )
        Defendants.                  )

## Memorandum and Order

Keith Leftridge by all accounts was a key employee of Inventory who'd been with the company nearly 35 years, but the company never had him sign any kind of employment agreement whatsoever. And while all employees owe a duty of loyalty, Missouri law makes clear that to impose additional duties on nonfiduciary employees, the employer must secure those duties via noncompete or other such agreements. When Leftridge joined competitor Packer, Inventory sued them both. At its core, this case raises the issue of whether Leftridge was a fiduciary, and if not, whether Inventory asserted a claim for breach of the duty of loyalty. The parties vigorously contest these issues in their competing motions for summary judgment, docs. 52, 60, which the Court now addresses.

1

## I.      Factual background

The Court's factual findings in this Memorandum and Order primarily rely on the joint statement of undisputed facts, doc. 45, and on the undisputed facts in each party's statement of additional uncontroverted facts in support of their respective motions for summary judgment, docs. 81, 84, 86.  But where a party disputes a fact, the Court has reviewed the cited sources and determined whether the party properly disputed the asserted fact with admissible evidence.  *See* Fed. R. Civ. P. 56(c).  Where a party has properly disputed a particular fact, the Court notes it. Otherwise, the Court finds the following facts undisputed for the purpose of deciding the parties' summary-judgment motions.

### A.      The distributors

Inventory and Packer distribute certain industrial items—fasteners, struts, weld studs, and the like—to construction and manufacturing companies.  Doc. 45 at ¶¶ 4.b., 4.i.; doc. 81 at ¶¶ 1, 8.  Based in St. Louis, Missouri, Inventory is a wholly owned subsidiary of Engineered Fastener Company, LLC.  Doc. 45 at ¶ 4.a.  In 2023, Inventory earned 30% of its revenue from the Kansas City Market.  Doc. 81 at ¶¶ 6–7.

Packer is a Wisconsin corporation headquartered in Green Bay, Wisconsin.  Doc. 45 at ¶ 4.h.  While Packer has several locations nationwide and distributes products nationwide, doc. 45 at ¶ 4.j.; doc. 81 at ¶¶ 10–11, Packer directly competes with Inventory in Kansas City, Missouri, doc. 84 at ¶ 11.  Before discussing the facts of this case, some industry background knowledge is necessary.

There are four relevant roles at a distributor such as Inventory:  (i) the outside sale representative, (ii) the inside sales representative, (iii) the procurement employee, and (iv) the warehouse employee.  Doc. 62-78 at ¶ 14; doc. 81 at ¶ 19.  The outside sales representative

generates, builds, and maintains relationships with customers.  Doc. 81 at ¶ 20.  He does so by staying in close contact with current and potential customers, knowing their needs and upcoming construction projects.  *Id.* at ¶ 21.  Next, the inside sales representative handles the daily work generated by the outside sales representative.  Doc. 62-7, Howard Bellamy Depo. Tr. at 40:4–40:23; doc. 81 at ¶ 23.  And if a customer complains about the price on an order, the outside sales representative may coordinate with the inside sales representative to adjust the price.  *Id.* at ¶¶ 41–42.

Last but certainly not least, come the procurement and warehouse employees.  Distributors don't manufacture the products they sell to customers—they distribute them.  Doc. 45 at ¶ 4.ee.  So inside sales representatives and procurement employees procure products from suppliers and vendors.  Doc. 62-4, Dan Feck Depo. Tr at 15:24–16:8; doc. 62-7, Howard Bellamy Depo. Tr. at 198:15–199:19; doc. 62-6, Jeff Jantzen Depo. Tr. at 39:10–40:6; doc. 81 at ¶ 44.  And then warehouse workers receive the procured material, package it, and ship it to customers.  Doc. 62-8, Thomas Mansholt Depo. Tr. at 96:4–97:8.

### B.    The employees

Defendant Keith Leftridge started at Inventory as a truck driver almost thirty-five years ago.  Doc. 45 at ¶ 4.e.; doc. 86 at ¶ 111.  He rose through the ranks, first as a warehouse employee, doc. 81 at ¶ 14, then as an inside sales representative, *id.* at ¶ 16, and then as Inventory's top outside sales representative, doc. 86 at ¶ 112.  During his entire tenure at Inventory, he was an at-will employee.  Doc. 81 at ¶ 59; doc. 62-78 at ¶ 5.  And though Inventory implemented an employee handbook in 2023 that directed employees to "maintain the confidentiality of confidential information entrusted to them," doc. 82-8 at 31, Inventory doesn't present evidence that Leftridge signed it, *see* doc. 62-11, Thomas Mansholt Depo. Tr. at 159:10–

160:8.  Leftridge only testified that he received the employee handbook in an company-wide email.  Doc. 58-23, Keith Leftridge Depo. Tr. at 352:6–352:22; *see also* doc. 62-11, Thomas Mansholt Depo. Tr. at 160:7–160:8.

Inventory also never had Leftridge sign a nonsolicitation or confidentiality agreement, doc. 45 at ¶¶ 4.z.–4.aa.; doc. 62-78 at ¶ 8.  Neither does Inventory present evidence that it negotiated with Leftridge for a nonsolicitation or confidentiality agreement.  Inventory also doesn't present evidence that it ever proposed to Leftridge that he sign a nonsolicitation or confidentiality agreement, or any type of employment agreement at all.  Leftridge stated that he never had a written employment agreement at any time during his nearly 35-year tenure.  Doc. 62-78 at ¶ 6.  And Inventory admits that Leftridge was not subject to any written contractual agreement.  Doc. 62-11, Thomas Mansholt Depo. Tr. at 168:2–168:5.

As an outside sales representative, Leftridge handled building and maintaining customer relationships with some of Inventory's most important clients:  Faith Technologies, U.S. Engineering, P1 Group, and Haas Mechanical Engineering.  Doc. 81 at ¶¶ 49, 53.  In servicing Inventory's clients, Leftridge worked closely with inside sales representatives Howard Bellamy and Jeff Jantzen.  Doc. 84 at ¶ 6; doc. 86 at ¶ 25.  Leftridge made about 21.4% of Inventory's construction sales nationwide.  *Id.* at ¶ 112.  In 2023, the accounts he serviced brought in $10.7 million in revenue.  Doc. 86 at ¶ 113.  And in just the first half of 2024, Leftridge earned more than $450,000 in commissions.  *Id.*

### C.    Customer-service issues at Inventory

At the beginning of 2024, Inventory implemented operational changes at the recommendation of its new owner, EFC.  Doc. 62-8, Thomas Mansholt Depo. Tr. at 148:3–150:13, 219:22–220:12; doc. 81 at ¶¶ 6, 83–85; doc. 62-15, Tamara Janke Depo. Tr. at 110:12–

110:19.  Customers complained of service issues, described below.  *Infra* I.C.1–2.  According to

Leftridge, he spent "most of [his] time apologizing [to clients] and trying to put out the fires."

Doc. 58-23, Keith Leftridge Depo. Tr. at 210:16–210:20.  But Inventory's COO—Thomas

Mansholt—noted that though he was aware of customers' concerns, *see, e.g.*, doc. 58-24; doc.

62-22; doc. 62-8, Thomas Mansholt Depo. Tr. at 189:11–189:19, he didn't think any customer

would imminently leave Inventory, doc. 82-25 at ¶ 22.  In any case, Leftridge resigned from

Inventory on June 21, 2024, doc. 45 at ¶ 4.w., and started at Packer three days later, doc. 45 at ¶¶

4.x.–y.  More on that to come; first, the Court discusses the various customer-service issues that

Inventory's clients experienced in 2024.

### 1.    Faith Technologies

Faith Technologies was a long-time customer of both Inventory and Packer.  Inventory

had "material sales" with Faith Technologies in Kansas City going back to 2002, doc. 86 at ¶

129, and a "well-established relationship" with it since at least 2020, doc. 45 at ¶ 5.fff.  Packer

had a long-term relationship with Faith Technologies in Wisconsin, but only "sporadic sales" in

Kansas City before the summer of 2024.  Doc. 62-13, Christina Olson Depo. Tr. at 93:1–93:13,

84:4–84:7 (describing sales of less than $50,000).

While Packer and Faith Technologies discussed working together in Kansas City as early

as 2020, the COVID-19 pandemic stalled talks.  Doc. 81 at ¶ 90.  And though talks restarted in

the second half of 2023, *id.* at ¶ 92, the tone only shifted in January 2024, *id.* at ¶ 94; doc. 62-15,

Tamara Janke Depo. Tr. at 100:18–101:10, 122:18–124:19.  Faith Technologies expressed

dissatisfaction with Inventory's customer service after EFC acquired Inventory.  Doc. 62-15,

Tamara Janke Depo. Tr. at 108:12–111:15.  Faith Technologies's corporate representative—

Tamara Janke—testified that the issues were bad enough that Faith Technologies expressed

concern to Inventory that without changes Inventory would lose some of its business.  *Id.* at 110:8–110:12 ("So in many cases, you know, we have even said like this is going to result in a loss of business, and nothing seems to change.").

At around the same time, Faith Technologies learned that Packer was opening a new facility in Olathe, Kansas.  Doc. 81 at ¶ 102; doc. 62-15, Tamara Janke Depo. Tr. at 127:12–128:13.  For Faith Technologies, "knowing that [Packer was] . . . going to be there gave us options that we didn't necessarily have before."  Doc. 62-15, Tamara Janke Depo. Tr. at 128:18–19.  Faith Technologies had already expanded its relationship with Packer in other markets.  *Id.* at 114:12–115:1; doc. 81 at ¶ 109.  And in Faith Technologies's experience, Packer's prices were generally lower than Inventory's prices.  Doc. 81 at ¶ 108; doc. 62-15, Tamara Janke Depo. Tr. at 138:17–139:11.  Faith Technologies also highly valued Packer's customer service.  Doc. 81 at ¶ 89; doc. 62-15, Tamara Janke Depo. Tr. at 126:6–127:1.

So as early as February 2024, even before the Olathe facility opened, Faith Technologies started placing some small orders with Packer in Kansas City.  Doc. 62-13, Christina Olson Depo. Tr. at 107:7–109:13, 154:7–154:24.  Faith Technologies's representatives also toured Packer's Olathe facility on May 21, 2024.  Doc. 45 at ¶ 4.bb.; doc. 81 at ¶ 103.  Faith Technologies still does business with Inventory, doc. 81 at ¶¶ 119–120, but since Leftridge's departure, its sales to Inventory have declined, *compare* doc. 86 at ¶ 104 (noting that Faith Technologies had a "robust sales activity" with Inventory) *with* doc. 62-11, Thomas Mansholt Depo. Tr. at 137:2–137:6 (noting that Inventory now does "very little" business with Faith Technologies).

### 2.   P1 Group, U.S. Engineering, and HME

Leftridge testified that P1 Group complained of customer service problems in 2024 that pushed P1 Group to seek out other distributors.  Doc. 58-23, Keith Leftridge Depo. Tr. at 117:22–118:3.  U.S. Engineering also experienced similar customer-service issues.  Doc. 58-24 at 2 (The Court cites to page numbers as assigned by CM/ECF.); doc. 62-8, Thomas Mansholt Depo. Tr. at 183:14–184:19, 185:24–189:10; doc. 81 at ¶¶ 125–126.  U.S. Engineering's general superintendent threatened Inventory in an email to Leftridge that "if this continues to be the way business will be done we will look elsewhere for this service."  Doc. 58-24 at 2; doc. 81 at ¶¶ 127–130; doc. 62-8, Thomas Mansholt Depo. Tr. at 189:11–189:19.  And HME's procurement manager—Marc Jaimes—told Inventory that its long-standing relationship with HME was "in jeopardy" if the issues weren't fixed.  Doc. 62-22 at 5; doc. 81 at ¶¶ 131–133.

### D.   Packer's Kansas City expansion

In January 2024—around the same time Faith Technologies started talking with Packer about a Kansas City expansion—Cupertino Electric approached Packer to collaborate on the Panasonic battery factory project in De Soto, Kansas.  Doc. 62-4, Dan Feck Depo. Tr. at 43:17–45:7; doc. 62-3, Terry Albrecht Depo. Tr. at 367:3–368:2; doc. 62-9, Jason Olbrantz Depo. Tr. at 24:1–24:4; doc. 81 at ¶ 134.  Packer then executed a one-year lease, effective March 1, 2024, for a 5,000 square foot warehouse in Olathe, Kansas, to support Cupertino and its few local customers.  Doc. 62-3, Terry Albrecht Depo. Tr. at 235:3–235:9; doc. 81 at ¶¶ 136–137.  But the Olathe warehouse wasn't big enough to service Packer's long-term plans for the Kansas City market.  Doc. 62-3, Terry Albrecht Depo. Tr. at 371:19–372:10; doc. 81 at ¶ 138.  So Packer engaged the same broker that it used to find the Olathe warehouse to secure a larger warehouse in the area.  *See* doc. 58-17.  In May 2024, Packer started seriously considering a larger

warehouse.  Doc. 62-3, Terry Albrecht Depo. Tr. at 238:23–239:2; doc. 58-17.  And a month

later, Packer signed a five-year lease for a 57,000 square-foot warehouse in Lenexa, Kansas.

Doc. 81 at ¶ 141.

### E.    Packer meets Leftridge

Inventory's new operational procedures were causing customer-service issues.  *Supra* I.C.

And Leftridge was frustrated with this predicament.  Doc. 58-23, Keith Leftridge Depo. Tr. at

210:11–210:20.  Enter Packer.  Around March 2024, representatives from Faith Technologies and

Gripple (a long-time vendor of Packer) separately suggested that Packer may want to hire

Leftridge.  Doc. 81 at ¶¶ 144–145; doc. 62-9, Jason Olbrantz Depo. Tr. at 45:6–45:25; doc. 81 at

¶¶ 218, 220–221; doc. 62-3, Terry Albrecht Depo. Tr. at 318:2–318:10.  So, on March 11, 2024,

Terry Albrecht—Packer's CEO—invited Leftridge via LinkedIn to lunch.  Doc. 45 at ¶ 4.k.; doc.

81 at ¶¶ 145–146.  Three weeks later, Albrecht and Leftridge had lunch in Kansas City—"just

kind of a meet-and-greet BS session."  Doc. 81 at ¶¶ 148–149.

### 1.    The Green Bay trip

But three weeks after that lunch, Albrecht called Leftridge to offer him a job at Packer.

*Id.* at ¶ 150.  Leftridge saw the offer as a way out of a "very bad spot" at Inventory.  *Id.* at ¶ 151.

So, on May 15, 2024, Leftridge—while employed at Inventory—traveled to Packer's

headquarters in Green Bay, Wisconsin.  *Id.* at ¶ 152.  During this visit, Leftridge toured the

facility, had lunch with senior Packer employees at Lambeau Field, participated in a round-table

discussion, and had dinner.  *Id.* at ¶ 153.

### 2.    The inventory list

Two days after the Green Bay trip, on May 17, 2024, Albrecht texted Leftridge that he

should "put some thought into initial inventory dollars needed to be successful."  *Id.* at ¶ 158.  So

Leftridge prepared an inventory list with items that "Packer should plan to stock in its Olathe, Kansas" facility.  Doc. 45 at ¶ 5.pp.; doc. 81 at ¶ 162; doc. 58-23, Keith Leftridge Depo. Tr. at 82:3–82:7.  Leftridge enlisted Jantzen and Bellamy to help with the inventory list.  Doc. 45 at ¶ 5.ss.  They too were looking to leave Inventory.  Doc. 81 at ¶¶ 174–178.  Communication among the three took place over their personal emails, out of Inventory's sight.  Doc. 84 at ¶ 63.

The parties dispute the inventory list's purpose.  *Contrast* Doc. 81 at ¶¶ 159–161, 168 (describing the list as a "guesstimation" to see whether Packer would be willing to invest in Leftridge); *with* doc. 84 at ¶¶ 59–60 (describing the list as a "part of the plotting" to use inside knowledge to steal business from Inventory).  Leftridge testified that the inventory list didn't help Inventory and that he "wasn't looking to help [Inventory]" at the time.  Doc. 45 at ¶ 5.rr; doc. 58-23, Keith Leftridge Depo. Tr. at 82:24–83:4.  Leftridge also testified that he made the inventory list from memory based on his experience and he did not consult any documents.  Doc. 81 at ¶¶ 163, 167.  On May 20, 2024, Leftridge orally accepted Packer's job offer.  *Id.* at ¶ 173; doc. 45 at ¶ 5.d.  And nine days later, Leftridge sent the inventory list to Albrecht.  Doc. 81. at ¶ 164.

### 3.    The factory tour

A day before Leftridge sent the inventory list to Albrecht, Albrecht invited Leftridge to tour a warehouse that Packer considered leasing in Kansas.  *Id.* at ¶ 184; doc. 45 at ¶ 5.vv.  The tour lasted twenty minutes, doc. 81 at ¶ 186, and Leftridge advised Albrecht on the warehouse, doc. 45 at ¶ 5.ww.  After all, he planned on "moving on to Packer" in a few weeks and looked to ensure that the warehouse could service his book of business.  Doc. 58-23, Keith Leftridge Depo. Tr. at 159:12–159:23.  Packer signed a lease for a larger facility in Lenexa, Kansas, at least in part on Leftridge's input.  Doc. 84 at ¶ 70.

9

### F.    Leftridge's preresignation contacts with customers and vendors

#### 1.    Faith Technologies

##### a.    Big packages to quote

As noted, Faith Technologies was a long-time customer of both Inventory and Packer. Doc. 86 at ¶ 129; doc. 81 at ¶ 88; doc. 45 at ¶ 5.fff.; doc. 62-13, Christina Olson Depo. Tr. at 93:1–93:13.  On May 21, 2024—a day after orally accepting Albrecht's offer to join Packer, and about a week before sending the inventory list to Albrecht—Leftridge texted Albrecht that Inventory sent some "big packages from Faith to quote," and that he was "torn on what to do." Doc. 82-14 at 3 (displaying Albrecht and Leftridge's text messages on May 21, 2024); doc. 86 at ¶ 54; doc. 81 at ¶ 230.  Leftridge testified that Faith Technologies sent the same package to Packer.  Doc. 81 at ¶ 231.  Albrecht and Leftridge had a phone call, and later that day Albrecht texted Leftridge "TCB"—taking care of business.  Doc. 82-14 at 3; doc. 81 at ¶¶ 232–233; doc. 86 at ¶ 56.

The parties dispute how to characterize these events.  *See* doc. 81 at ¶¶ 232–233. Inventory claims that "TCB" meant that Leftridge and Albrecht coordinated to undercut Inventory by $90,000 on the quote; hence, they took care of business.  *Id.*  Defendants claim that Leftridge and Albrecht agreed that each company would act in their best interest.  *Id.*  "May the best man win."  *Id.*  And "TCB," Defendants claim, referred to some inside joke between Albrecht and Leftridge.  *Compare* doc. 58-23, Keith Leftridge Depo. Tr. at 102:1–104:4 *with* doc. 62-3, Terry Albrecht Depo. Tr. at 173:4–174:6; *see also* doc. 82-14 at 4.  Regardless, Packer quoted Faith Technologies $221,439.80, doc. 81 at ¶ 238, and Inventory quoted $312,418.30, *id.* at ¶ 236.

### b. Bill of materials

A few weeks later, and three days before resigning from Inventory, Leftridge received at his Inventory email address a "[b]ill of materials for quote" from Faith Technologies. Doc. 62-37 at 2; doc. 81 at ¶ 241; doc. 45 at ¶ 5.ggg. Again, the parties dispute the document's purpose. According to Faith Technologies and Packer, the bill of materials was a "budget" to "gather information for Faith Technologies to then put in a quote for that project" for its client. Doc. 81 at ¶¶ 242–243 (cleaned up); *id.* at ¶¶ 244–246 (describing the bill of materials as a "prebid project"). But for Inventory, a bill of materials was "essential to ultimately receive business from a quote." *Id.* At any rate, Leftridge forwarded the email from Faith Technologies to his personal email address, doc. 62-37; doc. 45 at ¶ 5.ggg., and then to Albrecht, doc. 45 at ¶ 5.jjj. When asked about this incident, Leftridge testified that "I don't think it was appropriate for me to send it to my personal e-mail," doc. 84 at ¶ 81, and that he "probably jumped the gun," by forwarding the email to Albrecht, *id.* at ¶ 86; doc. 45 at 5.nnn.

### 2. Wesanco

Wesanco manufactures various industrial products that Inventory distributed to the Kansas City market. Doc. 84 at ¶ 37. In 2023 alone, Wesanco and Inventory did about $3 million in sales. Doc. 45 at ¶ 5.x. Bellamy testified that Wesanco was a "critical" supplier for Inventory's business. Doc. 62-7, Howard Bellamy Depo. Tr. at 116:20–116:23. Mansholt also testified that Wesanco was "very important [supplier]" in Kansas City, doc. 82-10, Thomas Mansholt Depo. Tr. at 78:5–78:6, as did Albrecht, doc. 62-3, Terry Albrecht Depo. Tr. at 42:15–42:20 (describing Wesanco as a "valuable contributor or supplier" in Kansas City).

At the end of May 2024, Leftridge was in contact with Chad Dormire—Wesanco's national account manager. *See* doc. 81 at ¶ 202; doc. 62-31, Chad Dormire Depo. Tr. at 63:25–

64:2.  The parties dispute the nature of Leftridge's conversations with Dormire.  *Compare* doc. 81 at ¶¶ 208–210 (arguing that Leftridge facilitated Wesanco's introduction to Packer) *with* doc. 86 at ¶ 78 (arguing that Leftridge never asked Wesanco "to get set up as a Packer vendor").  But it is undisputed that Leftridge shared Albrecht's email address with Dormire, doc. 84 at ¶ 40; doc. 81 at ¶ 202; doc. 62-30 at 9.  Nor is it disputed that Dormire then reached out to Albrecht to "start the process of setting up Packer Fastener as a new vendor."  Doc. 62-30 at 8–9; doc. 45 at ¶ 5.z.; doc. 81 at ¶ 203.

### 3.    National Pipe

National Pipe supplied Inventory with pipe hangers and supports for years.  Doc. 45 at ¶ 5.ll.; doc. 84 at ¶ 54; doc. 56-19 at 6.  In early June 2024, Leftridge was in contact with National Pipe's inside sales representative—Jason Irizarry.  Doc. 58-23, Keith Leftridge Depo. Tr. at 255:16–260:6; doc. 81 at ¶ 211.  Leftridge told Irizarry that he was leaving Inventory.  Doc. 81 at ¶ 212.  According to Leftridge, Irizarry asked if National Pipe could continue working with Leftridge at Packer.  *Id.*  Leftridge claims to have responded:  "You'll have to contact them.  I'm not part of that."  *Id.* at ¶ 213.  Irizarry pressed further, and Leftridge shared Albrecht's email address with him.  *Id.* at ¶¶ 214–215; doc. 45 at 5.gg; doc. 58-23, Keith Leftridge Depo. Tr. at 196:12–197:19.  Irizarry reached out to Albrecht to start establishing "a good business relationship."  Doc. 56-19 at 6.  He also sent Dan Feck, Packer's procurement director, a quote that "Keith [Leftridge] asked me to send to you that is for US KC."  *Id.* at 3, 5.

### 4.    Gripple

Packer has also done business for years with Gripple (a vendor).  Doc. 81 at ¶ 218; doc. 62-4, Dan Feck Depo. Tr. at 150:25–151:1.  Gripple had sales with Packer in Kansas City before Leftridge started at Packer.  Doc. 62-27, Dan Feck Depo. Tr. at 122:2–122:23 (noting $40,000 in

12

sales in the three months before Leftridge's start at Packer).  And it was Gripple, through its employee Kevin Heese, that referred Leftridge to Albrecht before their first communication in March 2024.  Doc. 81 at ¶¶ 220–221.  In early June, Leftridge and Heese exchanged text messages that referenced certain parts on a project on which Gripple was working.  *Id.* at ¶ 217.  Heese texted that "Packer better have those [parts] in stock!"  *Id.*; doc. 62-32 at 3.  Leftridge responded:  "Yes, they are on the stock list."  Doc. 81 at ¶ 217; doc. 62-32 at 3.

### 5.    U.S. Engineering, Waldinger, MMC, and P1 Group

In the days following those communications, Leftridge—upon request—sent W-9 forms or Packer credit applications to U.S. Engineering, Waldinger, MMC, and P1 Group.  Doc. 81 at ¶¶ 222–225, doc. 45 at ¶¶ 5.l., 5.q, 5.s, 5.bbb.  Leftridge claims that these companies "were ready to move on," doc. 81 at ¶ 226, and that they wanted to start working with Leftridge at Packer as soon as he started there, *id.* at ¶¶ 226–229.  Albrecht was pleased; Albrecht texted Leftridge "great news on US and MCC—keep it up."  Doc. 45 at 5.w.; doc. 84 at ¶ 35.  And on his second-to-last day at Inventory, Leftridge sent P1 Group's new vendor form to Albrecht.  Doc. 84 at ¶ 74.  The next day, Leftridge texted a Packer employee that "I'm planning on coming to you straight from Inventory Sales tomorrow morning with a fistful of dollars that we need to take care of."  *Id.* at ¶ 87.  All these companies now work with Packer in Kansas City.  Doc. 45 at ¶¶ 5.o., 5.r., 5.u., 5.ddd.

## II.    Procedural background

In late September 2024, Inventory sued Defendants Packer and Leftridge.  Doc. 1.  Inventory alleges that Leftridge breached various *fiduciary* duties to Inventory, *id.* at ¶ 70–76, and, in its summary-judgment briefing, claims it alleges Leftridge also breached his (nonfiduciary) duty of loyalty, doc. 80 at 15–17.  Inventory asserts a trade-secret-

misappropriation claim against Defendants under federal law, doc. 1 at ¶¶ 77–87, and state law, *id.* at ¶¶ 88–99. And Inventory also asserts against Defendants a tortious-interference-with-a-business-expectancy claim, *id.* at ¶¶ 100–106, and a civil-conspiracy claim, *id.* at ¶¶ 107–110.

After Defendants answered Inventory's Complaint, docs. 20, 22, the Court held a Rule 16 conference, doc. 31, and the Court issued a case-management order, doc. 32. Inventory filed a consent motion for a protective order, doc. 35—which the Court granted, doc. 36—and a consent motion to amend the case-management order, doc. 37, which the Court also granted, doc. 41. The Court then referred to case to ADR in August 2025. Doc. 42. The parties did not achieve a settlement. Doc. 48. The parties then filed Rule 702 motions, docs. 49, 57, and summary-judgment motions, docs. 52, 60. Having reviewed the parties' extensive briefing, docs. 50, 54, 58, 61, 71, 73, 75, 77, 78, 80, 83, 85, and Court-ordered supplemental briefing, *see* doc. 89; docs. 90, 91, 92, 93, the Court now addresses the parties' summary-judgment motions. Docs. 52, 60.

## III.    Summary judgment motions

### A.    Legal Standard

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the Court must view the evidence "in the light most favorable to the non-moving party" and must give that party "the benefit of all reasonable inferences to be drawn from the underlying facts." *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987). The moving party bears the initial burden of showing both the absence of a genuine dispute of material fact

14

and entitlement to judgment as a matter of law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); Fed. R. Civ. P. 56(a).

In response to the proponent's showing, the opponent's burden is to "come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis omitted). Self-serving, conclusory statements without support are insufficient to defeat summary judgment.  *See Armour & Co., Inc. v. Inver Grove Heights*, 2 F.3d 276, 279 (8th Cir. 1993).  Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### B.    Defendants' motion for summary judgment

Defendants move for summary judgment on all counts.  *See* doc. 60.  For the reasons stated below, the Court grants Defendants' summary-judgment motion.

#### 1.    Judicial estoppel

Defendants assert that judicial estoppel precludes Inventory from claiming it has any trade secrets due to representations Inventory's parent company made in the parent company's tax filings, and based on a third-party valuation.  *See* doc. 61 at 10–11.  It's debatable whether assertions in a tax return, which presumably rely on taxation and accounting principles rather than trade-secret law, can support a claim of judicial estoppel, and the parties cite no Missouri law addressing tax returns.  *See id.*; *see also* doc. 80 at 31; doc. 85 at 11–13.  Defendants also fail to explain, much less support with authority, that the assertions of a parent company—a separate entity in the eyes of the law—can support judicial estoppel against a subsidiary.  *See* doc. 61 at

10–11; *see also* doc. 80 at 31; doc. 85 at 11–13.  They similarly fail to explain or support how statements of a third-party valuation company can support such a claim.  *See* doc. 61 at 10–11; *see also* doc. 80 at 31; doc. 85 at 11–13.  The Court need not address these underdeveloped issues, *see* E.D. Mo. L.R. 4.01(A) ("the moving party must file with each motion a memorandum in support of the motion, including any relevant argument and citations to any authorities on which the party relies."), and instead resolves the motions on other grounds.

### 2.    Trade secret misappropriation

Inventory alleges several categories of trade secret misappropriation under the federal Defend Trade Secrets Act (count II) and the Missouri Uniform Trade Secrets Act (count III).  Doc. 1 at ¶¶ 77–99.  "Because these statutes are essentially identical, [the Court] can analyze the claims together."  *Ahern Rentals, Inc. v. EquipmentShare.com, Inc.*, 59 F.4th 948, 955 (8th Cir. 2023).  To merit summary judgment, Defendants must demonstrate an absence of a genuine dispute of a material fact and entitlement to judgment as a matter of law regarding "the existence of a protectable trade secret and misappropriation of that trade secret."  *Id.* (citation omitted); Fed. R. Civ. P. 56.

The federal statute defines "trade secret":

(3) . . . all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—

(A) the owner thereof has taken reasonable measures to keep such information secret; and

(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

16

18 U.S.C. § 1839(3); *see also* Mo. Rev. Stat. § 417.453(4).  "In short, qualifying information constitutes a trade secret [under the federal Defend Trade Secrets Act and the Missouri Uniform Trade Secrets Act] if:  (1) the owner has taken reasonable measures to keep it secret and (2) the information derives independent economic value from it not being generally known."  *Farmers Ins. Exch. v. Jasper*, No. 4:23-cv-00406-SRC, 2023 WL 7181661 at *4 (E.D. Mo. Nov. 1, 2023).  The statutes define "misappropriation" similarly:

> (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (B) disclosure or use of a trade secret of another without express or implied consent by a person who—
>
>> (i) used improper means to acquire knowledge of the trade secret;
>>
>> (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—
>>
>>> (I) derived from or through a person who had used improper means to acquire the trade secret;
>>>
>>> (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or
>>>
>>> (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or
>>
>> (iii) before a material change of the position of the person, knew or had reason to know that—
>>
>>> (I) the trade secret was a trade secret; and
>>>
>>> (II) knowledge of the trade secret had been acquired by accident or mistake.

18 U.S.C. § 1839(5); *see also* Mo. Rev. Stat. § 417.453(2).  Inventory identified several categories of protectable trade secrets that are "sufficiently specific" for the Court's

determination.  *See* doc. 81 at ¶ 254; *see also Morley v. Square, Inc.*, No. 4:14-cv-00172-SNLJ, 2015 WL 13676450, at *2 (E.D. Mo. Oct. 27, 2015).  The Court addresses each category in turn.

### a.    Common-customer pricing, vendor pricing, and margins for key customers

Jantzen—Inventory's former inside sales representative—testified that knowing Inventory's prices gave him an "advantage."  Doc. 86 at ¶ 84.  And after joining Packer, Jantzen discussed what Inventory "normally charge[d]" its customers with Leftridge.  *Id.* at ¶ 85.  Jantzen also quoted Inventory's prices from memory for Packer's customers.  *Id.* at ¶ 86.  He did this so he could "essentially . . . hit the ground running using information [he] learned from [Inventory] to help [him] at Packer."  *Id.* at ¶ 87.  Bellamy—another former Inventory inside sales representative—similarly testified he was "able to structure Packer's pricing . . . to be competitive compared to what [he] knew [Inventory] had recently priced."  *Id.* at ¶ 88.  One such example:  a former Inventory customer emailed Bellamy for a quote on certain items.  *Id.* at ¶ 90.  Bellamy responded that Packer "will also beat the current costs you are paying from [Inventory]."  *Id.* at ¶ 91.

Packer responds that customer-pricing information is not a trade secret, because it is "readily ascertainable through proper means."  18 U.S.C. § 1839(3)(B); *see* doc. 61 at 15–16 (citing *Double Eagle Alloys, Inc. v. Hooper*, 134 F.4th 1078, 1093–94 (10th Cir. 2025)).  On these facts, the Court agrees.  Even though Inventory considers its pricing confidential, *see* doc. 80 at 33, Inventory only infrequently contractually requires that customers keep its prices secret, doc. 62-11, Thomas Mansholt Depo. Tr. at 34:19–37:8; doc. 82-10, Thomas Mansholt Depo. Tr. at 36:11–36:17; doc. 81 at ¶¶ 289–290, *see AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.*, 663 F.3d 966, 974 (8th Cir. 2011) ("The use of proprietary legends on documents or the existence of confidentiality agreements are frequently-considered factors in establishing or

18

denying a trade secret claim."). *cf. Sigma Chem. Co. v. Harris*, 794 F.2d 371, 373–374 (8th Cir. 1986) (describing different measures taken to protect confidential information). And Inventory admits—much to its chagrin—that customers do share its pricing with others from time to time, doc. 62-11, Thomas Mansholt Depo. Tr. at 39:1–41:23.

And Inventory's case law in support is either nonbinding or inapposite. *See* doc. 80 at 33. But most relevant here, in *Synergetics,* the Eight Circuit noted that the jury found that information related to product pricing constituted a trade secret. *Synergetics, Inc. v. Hurst*, 477 F.3d 949, 957 (8th Cir. 2007). But in *Synergetics*, the company took "reasonable measures to keep such information secret." 18 U.S.C. § 1839(3)(A); *see Synergetics*, 477 F.3d at 954. The company required its salespersons to sign confidentiality agreements that stated that "while employed or after the termination of their employments—they would not disclose or use in any manner whatsoever, any of the Confidential Information acquired during their employment with Synergetics." *Synergetics*, 477 F.3d at 953 (cleaned up). Inventory never had its employees and rarely had its customers sign confidentiality agreements. doc. 45 at ¶¶ 4.z.–4.aa.; doc. 62-11 at 34:19–37:8; doc. 81 at ¶¶ 62, 196, 289–291.

### b.    Customer volume information and purchase preferences

Thomas Mansholt—Inventory's COO and corporate representative—testified that Leftridge knew what "product mix" each customer bought "in a given time frame." Doc. 62-11, Thomas Mansholt Depo. Tr. at 26:11–26:14; *see R & B Appliance Parts, Inc. v. Amana Co., L.P.*, 258 F.3d 783, 786 (8th Cir. 2001) (holding that a corporation is "certainly bound" by the statements of its corporate representative in a Rule 30(b)(6) deposition); *see also Bertrang v. Wis. Cent., Ltd.*, 301 F.R.D. 364, 367 (D. Minn. 2014) ("In a Rule 30(b)(6) deposition, the corporate representative and the corporation are one and the same."). And Leftridge used that

19

knowledge to create the inventory list for Albrecht.  *See* doc. 62-11, Thomas Mansholt Depo. Tr. at 26:15–26:18.  And if Leftridge and Packer "didn't know the volumes, they would not have been able to prepare like they did." *Id.* at 27:2–27:4.  Mansholt also testified that customer purchase preferences "parallels along the same lines as understanding what products the customers purchase and volumes that they are purchasing in." *Id.* at 47:24–48:2.

But on these facts, Leftridge's knowledge of a customer's purchase volume or purchase preferences does not constitute a trade secret.  After all, Inventory admits that this information is "readily ascertainable through proper means," because Packer and Leftridge could have simply asked the customers for that information.  18 U.S.C. § 1839(3)(B); doc. 62-11, Thomas Mansholt Depo. Tr. at 26:7–27:10.  Customers are free to share that information with whomever they choose; it's the customer's information—not Inventory's.  *See id.* at 47:18–49:23; *Hi-Line Elec. Co. v. Moore*, 775 F.2d 996, 997 (8th Cir. 1985) (affirming the district court's conclusion that customer information cannot constitute a trade secret when it's readily ascertainable); *Tension Envelope Corp. v. JBM Envelope Co.*, 876 F.3d 1112, 1122 (8th Cir. 2017) (applying Missouri case law that customer preferences are not trade secrets because they are readily ascertainable).  Inventory did not have Leftridge sign a noncompetition or nonsolicitation agreement.  Doc. 45 at ¶¶ 4.z.–4.aa.; doc. 62-78 at ¶ 8; doc. 81 at ¶ 196; doc. 62-11, Thomas Mansholt Depo. Tr. at 168:2–168:5.  (The Court recognizes that a wide variety of such agreements exists, with some broadly restricting competition, solicitation, and disclosure of confidential information while others have a more narrow scope; the Court uses various terms such as noncompete-, noncompetition-, nonsolicitation- , confidentiality-, and perhaps nondisclosure-agreements, or variants of those, to generically refer to such agreements.)  And absent such agreements, "it would really be unfair competition to allow [Inventory] . . . to obtain trade secret status for the

fruits of ordinary experience in the business."  *See Vigoro Indus., Inc. v. Crisp*, 82 F.3d 785, 790 (8th Cir. 1996) (citation omitted).

> **c.    Customer- and-vendor-specific strategies to win business**

The same is true for Inventory's customer- and-vendor-specific strategies to win business.  Mansholt testified that Inventory's general strategy "was to continue to push and expand in Kansas City . . . to continue to invest in those customers and ensuring we're in front of those customers."  Doc. 62-11, Thomas Mansholt Depo. Tr. at 56:3–56:8.  But treating ordinary business strategies as a trade secret would transform all economic activity into unfair competition.  *See Vigoro*, 82 F.3d at 790 (applying both statutory and common law, and explaining the phrase "readily ascertainable by proper means," which is found in the Arkansas Uniform Trade Secrets Act, the Missouri Uniform Trade Secrets Act, and the federal Defend Trade Secrets Act's definition of a trade secret).  Inventory's description of ordinary business strategies—like expanding one's business or investing in one's customers—is not "sufficiently specific" for the Court to afford it trade-secret protection.  *See Morley*, 2015 WL 13676450, at *2.

Mansholt also stated that Inventory possessed specific strategies for its major customers and vendors, doc. 62-11, Thomas Mansholt Depo. Tr. at 55:18–56:21, but then immediately disclaimed knowledge or specifics of such strategies, *id.* at 56:21–58:7.  When pushed to identify any specific strategy misappropriated by Leftridge and Packer, Mansholt testified that "[Leftridge] was diverting that business while he was working for [Inventory] for Packer."  *Id.* at 58:25–59:1.

At base, Inventory claims that its strategy was essentially to not divert, *i.e.* keep, its customers; the Court fails to see how such a basic business tenet counts as a "strategy," much

21

less how it counts as a "trade secret."  While Leftridge's preresignation contacts are relevant to Inventory's fiduciary-duty claim, these preresignation "customer contacts" are not protectable as a trade secret.  *See W. Blue Print Co., LLC v. Roberts*, 367 S.W.3d 7, 18 (Mo. 2012) (en banc); *see also Tension*, 876 F.3d at 1122.  Sales personnel, like Leftridge, "may exert a special influence over that customer and entice that customer's business away from the employer."  *See W. Blue Print*, 367 S.W.3d at 18 (citation omitted) (cleaned up).  Inventory's "means of protection" was a "non-competition agreement."  *Id.*  Yet despite knowing that Leftridge made over 20% of its construction sales nationwide, doc. 86 at ¶ 112, it still failed to protect itself with a noncompetition agreement.  *See W. Blue Print*, 367 S.W.3d at 18.  Standing alone and absent a noncompete agreement, Leftridge's special influence over Inventory's customers doesn't transform the relationships into protectable trade secrets.  *Id.*

### d.    Forward-looking-strategic plans

The only specific forward-looking-strategic plan that Inventory alleged is a trade secret is Inventory's Commercial Optimization Plan.  Doc. 62-11, Thomas Mansholt Depo. Tr. at 76:10–77:11.  The Commercial Optimization Plan detailed Inventory's strategies on arranging geographic markets, commission structures, target customers, and market information.  Doc. 81 at ¶ 332.  Assuming that the plan is a protectable trade secret, Inventory doesn't point to any evidence that Leftridge used the plan to divert customers to Packer.  In fact, Inventory is "not aware of how [Leftridge] could have used it," doc. 62-11, Thomas Mansholt Depo. Tr. at 77:12–77:20, or that Packer ever had access to it, *id.* at 62:11–63:3.

### e.    Uniquely fabricated products

Inventory asserts that it distributes a "uniquely fabricated product" known as "Vienna Arms."  Doc. 81 at ¶ 337.  Vienna Arms are struts cut to a certain length.  *Id.* at ¶ 338.  Faith

Technologies designed the Vienna Arms and Wesanco built them to Faith Technologies's specifications. *Id.* at ¶ 340. Wesanco then would sell Vienna arms to Inventory, which in turn distributed them back to Faith Technologies. *Id.* at ¶ 339.

Inventory cannot have a trade secret for an item that Faith Technologies designed and Wesanco built, and that Inventory only distributed. Inventory isn't the "owner" of any such trade secret, *see* 18 U.S.C. § 1839(4)—it only distributes another owner's alleged trade secret, doc. 81 at ¶¶ 43, 339. And even if the Vienna Arms were Inventory's product, they don't appear to be uniquely fabricated; Faith Technologies now buys the same items from a different vendor—Kansas Structural Steel. Doc. 81 at ¶ 341. Assuming further still that Faith Technologies only bought the Vienna Arms from Inventory, Inventory concedes that Packer never sold Vienna Arms to Faith Technologies. *Id.* at ¶ 343; doc. 62-11, Thomas Mansholt Depo. Tr. at 126:4–126:6.

###### f.    Identity and relationship with Inventory's vendor

Inventory also asserts that Leftridge and Packer misappropriated the identity and relationship of Inventory's vendors. Doc. 62-11, Thomas Mansholt Depo. Tr. at 82:21–83:10. But Leftridge's "knowledge of industry contact people does not rise to the level of a trade secret because this type of unprotected information is readily ascertainable within a trade." *Fox Sports Net N., L.L.C. v. Minnesota Twins P'ship*, 319 F.3d 329, 336 (8th Cir. 2003). And as Inventory notes, because it has no exclusivity contracts with its vendors, they are free to work with any distributor they so choose. Doc. 62-11, Thomas Mansholt Depo. Tr. at 32:20–33:1. The Court finds that, on these facts, vendor contacts—much like customer contacts—are not protectable

trade secrets. *See Fox Sports*, 319 F.3d at 336; *cf. Sigma Chem.*, 794 F.2d at 373–374 (describing different measures taken to protect vendor files).

### g.    Other alleged trade secrets

Finally, during discovery, Inventory provided a list of 167 documents that were "representative examples of the unique and extensive trade secret knowledge to which Defendant Leftridge was provided access during his employment at Inventory." Doc. 86 at ¶ 110. These remaining documents are either emails or attachments to emails that Inventory produced in discovery. Doc. 81 at ¶ 347. Of the 167 documents, Leftridge sent 10 documents to his personal email. *Id.* at ¶ 348. The remaining 157 documents were those that Leftridge received in the ordinary course of business. *Id.* at ¶ 349. Inventory states that it "never represented that Leftridge took all 167 documents with him to Packer and used them to compete with [Inventory]." *Id.* at ¶ 346. Instead, these documents "reflect the type of information—particularly pricing—that Leftridge . . . had access to, memorized, and could rely upon to pilfer business from [Inventory]." Doc. 80 at 37.

Inventory's arguments fail. Inventory doesn't provide evidence that Leftridge actually misappropriated the pricing information contained in these documents. Inventory states only that Leftridge "could" have relied on the information contained in the documents that he received in the ordinary course of business to divert business from Inventory to Packer. Doc. 80 at 37. But Leftridge's reliance on industry knowledge and experience, gained over decades of work at Inventory without any type of confidentiality or other agreement, doesn't show that he misappropriated any trade secret contained in those documents. *See Prime Therapeutics LLC v. Beatty*, 354 F. Supp. 3d 957, 971 (D. Minn. 2018) (reasoning that receiving a document during the ordinary course of business doesn't imply that the person then misappropriated that

document).  For one, Leftridge cannot "misappropriate" industry knowledge and experience lawfully gained during the ordinary course of business.  *See* 18 U.S.C.§ 1839(5)-(6) (defining "misappropriation" and "improper means").  After months of discovery, Inventory can no longer gesture to amorphous material, or in their words, "***the kind of information*** to which Defendant Leftridge had access"—and claim that Leftridge misappropriated that information.  Doc. 80 at 37 (emphasis in original).

The cases Inventory cites are also inapposite (and nonbinding).  *See id.*  To be sure, Inventory correctly states that an employee can memorize a specific trade secret and misappropriate it.  *See* doc. 80 at 34 (citing *Allstate Ins. Co. v. Ameriprise Fin. Servs., Inc.*, No. 17-cv-5826, 2023 WL 5334638, at *24 (N.D. Ill. Aug. 18, 2023) ("Memorization is one manner in which a trade secret may be misappropriated.")).  But Inventory provides no evidence that Leftridge did so; only that he had access to documents during the ordinary course of business. *See id.*  Inventory's argument again essentially transforms all professional knowledge about an industry into a trade secret.  Having found that Inventory has not identified protectable trade secrets, the Court therefore grants Defendants' motion for summary judgment for Inventory's trade-secret-misappropriation claims under federal law (count II) and state law (count III).

### 3.    Breach of fiduciary duty

Defendants also move for summary judgment on Inventory's fiduciary-duty claim.  *See* doc. 60 at 1.  They argue that Inventory in count I only pleaded that Leftridge breached his fiduciary duty to Inventory; and because Leftridge isn't a fiduciary, the Court should grant summary judgment to Defendants.  *See* doc. 61 at 21–22.  Inventory—in its response brief, doc.

25

80—claims that in count I it actually pleaded two distinct theories:  (i) breach of fiduciary duty, and (ii) breach of the duty of loyalty. Doc. 80 at 15–24.  The Court disagrees.

Under Missouri law, breach of fiduciary duty and breach of the duty of loyalty are distinct actions that have different elements.  *See CIBC Bank USA v. William*s, 669 S.W.3d 298, 307–309 (Mo. Ct. App. 2023); *see also Farm J., Inc. v. Johnson*, No. 4:19-cv-00095-SRB, 2019 WL 1795945, at *4 (W.D. Mo. Apr. 24, 2019) (citing doc. 1 at ¶¶ 104–105).  Every employee owes a duty of loyalty, *see Scanwell Freight Express STL, Inc. v. Chan*, 162 S.W.3d 477, 479 (Mo. 2005), but not every employee owes a fiduciary duty, *see W. Blue Print*, 367 S.W.3d at 15; *see also Zemitzsch v. Harrison*, 712 S.W.2d 418, 421 (Mo. Ct. App. 1986) (holding that "an employer-employee relationship, without more, is insufficient to" create a confidential relationship that establishes an employee's fiduciary duty).

Further, a party may not amend a complaint through a brief.  *Thomas v. United Steelworkers Loc. 1938*, 743 F.3d 1134, 1140 (8th Cir. 2014).  "The essential function of notice pleading is to give the defendant fair notice of what the claim is and the grounds upon which it rests."  *Allan v. Minn. Dep't of Hum. Servs.*, 127 F.4th 717, 720 (8th Cir. 2025) (quoting *WireCo WorldGroup, Inc. v. Liberty Mut. Fire Ins. Co.*, 897 F.3d 987, 992 (8th Cir. 2018)); *see also Warmington v. Bd. of Regents of Univ. of Minn.*, 998 F.3d 789, 795–76 (8th Cir. 2021); *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 848 (8th Cir. 2014).

Notably, Inventory only cites *Topchian* to support its argument that it pleaded two separate claims in one count, though the case lends little support to Inventory.  *See* doc. 80 at 15 n.4.  That case involved the liberal-construction rules applicable to *pro se* complaints, and even so, the Eighth Circuit emphasized that its "holding should not be read as imposing any sweeping duty on district courts to devise legal theories for *pro se* plaintiffs."  *Topchian*, 760 F.3d at 854.

The Federal Rules of Civil Procedure allow a party to plead two or more claims in a single count, Fed. R. Civ. P. 8(d)(2), but the Court must construe Inventory's pleading as written, not its after-the-fact characterization of it.  And while the Court "recognize[s] that the pleading requirements under the Federal Rules are relatively permissive, they do not entitle parties to manufacture claims, which were not pled, late into the litigation for the purpose of avoiding summary judgment."  *Allan*, 127 F.4th at 720 (quoting *N. States Power Co. v. Fed. Transit Admin.*, 358 F.3d 1050, 1057 (8th Cir. 2004)).

The Court "is not required to divine [Inventory's] intent and create claims that are not clearly raised."  *See Warmington*, 998 F.3d 789, 796 (quoting *Gregory v. Dillard's, Inc.*, 565 F.3d 464, 473 (8th Cir. 2009)).  "Indeed, it is in the context of alternative and hypothetical pleading that a party must exercise the greatest care so as not to transgress the requirement in Rule 8(d)(1) of simple, direct, and concise pleading."  5 *Wright & Miller's Federal Practice & Procedure* § 1282 (4th ed. 2025).

Construing the pleading, the Court finds that Inventory only pleaded one claim in count I.  Inventory labelled count I as "Breach of The Fiduciary Duty of Loyalty."  Doc. 1 at 18.  Recognizing that the Court must look past labels to the substance of the pleading, the substantive allegations of count I plead the elements of breach of fiduciary duty and repeatedly use that term.  *Id*. at 18–19.  Count I does not speak in terms of an alternative claim for breach of the duty of loyalty.  *Id*.

Count I did not put Defendants on notice that they were defending two separate theories of liability.  *See Allan*, 127 F.4th at 720 (quoting *WireCo.*, 897 F.3d at 992); *see also Warmington*, 998 F.3d at 795.  To allow Inventory to retroactively recast its pleading, via a summary-judgment brief, well after both pleadings and discovery have closed, as asserting two

27

separate claims—deprives Defendants of their right to develop litigation and discovery strategies before discovery has closed. *See Allan*, 127 F.4th at 720 ((stating that parties cannot "manufacture claims, which were not pled, late into the litigation for the purpose of avoiding summary judgment.") (quoting *N. States Power Co.*, 358 F.3d at 1057)); *see also InfoDeli, LLC v. W. Robidoux, Inc.*, 136 F.4th 792, 801 n.6 (8th Cir. 2025) (explaining that "[n]ew claims are properly raised through amended complaints, not opposition briefs."). The Court therefore finds Inventory only pleads a claim for breach of fiduciary duty and addresses Defendants' motion for summary judgment on that claim alone.

To merit summary judgment, Defendants must show that no genuine dispute of material fact exists and its entitlement to judgment as a matter of law regarding (i) whether Leftridge had a fiduciary duty, (ii) whether Leftridge breached that duty, and (iii) whether the breach caused harm to Inventory. *See CIBC Bank USA*, 669 S.W.3d at 307; *see also Knockerball MidMo, LLC v. McGowan & Co., Inc.*, 667 S.W.3d 640, 646 (Mo. Ct. App. 2023); Fed. R. Civ. P. 56.

### a.    Fiduciary duty

In Missouri, typically only "officers and directors of . . . corporations are fiduciaries because they occupy positions of the highest trust and confidence and are required to exercise the utmost good faith" when exercising their authority. *W. Blue Print*, 367 S.W.3d at 15. But an at-will employee may owe a fiduciary duty in limited circumstances—namely, when acting as a "de[-]facto officer" or when in a "confidential relationship" with one's employer. *Id.* at 15–16.

### i.    De-facto officer

First consider Inventory's de-factor officer theory. An at-will employee can act as a de-facto officer when the employee engages in "the activities of top echelon corporate officials" or when the employee exercises discretionary authority over the corporation. *Id.* at 15–16

28

(citation omitted). During his employment at Inventory, Leftridge worked as an at-will employee. Doc. 81 at ¶ 59. Though Inventory might have considered Leftridge a "de facto Sales Manager," doc. 86 at ¶ 117, Leftridge was not an officer, director, or member of upper management. Doc. 62–78 at ¶ 7; doc. 81 at ¶ 61. He also didn't have an employment contract. Doc. 62-78 at ¶ 6; doc. 81 at ¶ 59. Nor was Leftridge responsible for setting employee compensation or for employee management. Doc. 62-78 at ¶ 10; doc. 81 at ¶¶ 63–64. He was Inventory's top outside sales representative—a "force of nature", doc. 80 at 17—but not a de-facto officer. Doc. 86 at ¶ 112 (noting that Leftridge was Inventory's "top external salesperson").

To be sure, in some circumstances a sales representative (or even a "de facto Sales Manager") can owe his employer a fiduciary duty. *See Synergetics*, 477 F.3d at 959. But in *Synergetics*, the salespeople filled "high-level sales positions with the company." *Id.* at 953. They handled personnel management and accounts across the country. *Id.* They were also members of the "company's most strategic committee." *Id.*; *cf. W. Blue Print*, 367 S.W.3d at 15–16 (holding that typically employees like a "sales manager, a purchasing agent, and a branch office manager" do not owe fiduciary duties to their employer). Leftridge—despite his importance to Inventory, *see* doc. 86 at ¶¶ 112–121—did not owe Inventory a fiduciary duty under a de-facto officer theory.

### ii.    Confidential relationship

Next consider Inventory's confidential-relationship theory. "Generally, an employer-employee relationship, without more, is insufficient to cause a confidential relationship to exist as to knowledge naturally acquired during employment." *W. Blue Print*, 367 S.W.3d at 16 (citation omitted) (cleaned up). "To establish a confidential relationship between an employer

and an employee, there must be either an express understanding as to the confidential nature of the information or it must be acquired under such circumstances that the employee must necessarily be aware of the confidence reposed in him." *Id.* (cleaned up).

Here, Leftridge never signed a confidentiality or nonsolicitation agreement with Inventory. Doc. 45 at ¶¶ 4.z.–aa.; doc. 81 at ¶ 62; *see also W. Blue Print*, 367 S.W.3d at 16. No evidence in the record suggests that Inventory ever asked Leftridge to sign such an agreement, much less even broached the subject with him. And even if Leftridge had signed it, the employee handbook—applicable to all employees—does not create a confidential relationship with every employee for all information naturally acquired while employed at Inventory. *See W. Blue Print*, 367 S.W.3d at 16. Again, as the Supreme Court of Missouri noted, Inventory's "proper means of protection [was] a non-competition agreement." *W. Blue Print*, 367 S.W.3d at 18 (quoting *Zemitzsch*, 712 S.W.2d at 422). Defendants "should not be held liable for [Inventory's] failure to take precautions." *Id.* Inventory also presents no evidence that the information Leftridge had access to was "entrusted solely" to him. *See id.* Leftridge therefore did not owe Inventory a fiduciary duty under a confidential-relationship theory. And so, the Court grants Defendants' motion for summary judgment for Inventory's fiduciary-duty claim.

### 4.    Tortious inference with a business expectancy

Lastly, Defendants move for summary judgment on Inventory's tortious-inference-with-a-business-expectancy claim. *See* doc. 60 at 1. To merit summary judgment, Defendants must demonstrate an absence of a genuine dispute of material fact and its entitlement to judgment as a matter of law as to whether:  (1) a contract or a valid business expectancy existed; (2) they knew of the contract or relationship; (3) their intentional interference caused a breach of the contract or

relationship; (4) absence of justification; and (5) damages that resulted from its conduct. *See W. Blue Print*, 367 S.W.3d at 19; *see also* Fed. R. Civ. P. 56.

Inventory alleges that Defendants tortiously interfered with its customer and vendor relationships. Doc. 1 at ¶¶ 100–106; doc. 62-61 at 14–15 ("Inventory states as follows: Defendants Packer and Leftridge intentionally interfered with Inventory's reasonable expectation of future business relationships with certain customers and vendors, including but not limited to the following: Faith; U.S. Engineering; Wesanco; and Gripple."). But the law forecloses Inventory's argument that it had a valid business expectancy; any valid business expectancy attached to Leftridge, not to Inventory.

While a "regular course of prior dealings suggests a valid business expectancy," "in the sales industry the goodwill of a customer frequently attaches to the employer's sales representative personally; the employer's product becomes associated in the customer's mind with that representative." *W. Blue Print*, 367 S.W.3d at 18–19 (citations omitted) (cleaned up). And again, Inventory's "proper means of protection [was therefore] a non-competition agreement." *Id.* at 18. But Inventory never had Leftridge sign any noncompete, nonsolicit, nondisclosure, or other agreement, and apparently never even proposed one. Doc. 81 at ¶ 62; doc. 45 at ¶¶ 4.z.–aa. Leftridge "should not be held liable for [Inventory's] failure to take precautions." *Zemitzsch*, 712 S.W.2d at 422. The Court therefore grants Defendants' motion for summary judgment on Inventory's tortious-inference-with-a-business-expectancy claim.

## C.    Inventory's motion for partial summary judgment

Inventory moves for partial summary judgment on the duty and breach elements of its fiduciary-duty claim as well as on the duty and breach elements of its civil-conspiracy claim. Doc. 52. Having found as a matter of law that Leftridge owed no fiduciary duty to Inventory, the

Court denies Inventory's motion for partial summary judgment on these elements of its fiduciary-duty claim. Doc. 52 at 1.

Inventory also moves for summary judgment on Defendants' liability for its civil-conspiracy claim. *Id*. But civil conspiracy "is not a separate and distinct action." *W. Blue Print*, 367 S.W.3d at 22. Instead, civil conspiracy "hold[s] the conspirators jointly and severally liable for the underlying act." *Id.* (citation omitted). Inventory does not dispute that its civil-conspiracy claim rises and falls with its other tort claims. Doc. 80 at 37; *see also* doc. 78 at 15. Because the Court denied Inventory's motion for partial summary judgment on the duty and breach elements of its fiduciary-duty claim, the Court also denies Inventory's motion for partial summary judgment on its civil-conspiracy claim.

## IV.      Conclusion

Accordingly, the Court grants Defendants' [60] motion for summary judgment. The Court therefore enters judgment in Defendants' favor on all counts, dismissing this case with prejudice. The Court also denies Inventory's [52] motion for partial summary judgment. The Court therefore denies as moot the parties' [49] [57] respective motions to exclude certain expert opinions. The Court also denies as moot Inventory's [87] motion for leave to file a sur-reply. A separate judgment accompanies this Memorandum and Order. The parties' respective motions for leave to file under seal, docs. 53, 59, remain under submission. The Court will address those issues in a forthcoming order.

So ordered this 6th day of January 2026.

_____
STEPHEN R. CLARK
CHIEF UNITED STATES DISTRICT JUDGE